**[Cite as *State v. Nation*, 2023-Ohio-106.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Sylvania                    Court of Appeals No.  L-21-1251

    Appellee                    Trial Court No.  TRC2002853A

v.

Brandon Nation                    **DECISION AND JUDGMENT**

    Appellant                    Decided:  January 13, 2023

\* \* \* \* \*

Blaise C. Katter and Tim Huey, for appellant.

\* \* \* \* \*

**OSOWIK, J.**

## I.     Introduction

**{¶ 1}** This is an appeal from a judgment of the Sylvania Municipal Court's decision to deny defendant-appellant's motion to suppress evidence.  Appellant challenges this denial, arguing that his arrest lacked competent, credible evidence; that the officer failed to substantially comply with the guidelines and regulations established

by the National Highway Traffic Safety Administration ("NHTSA") in the conduction of standardized field sobriety tests ("SFSTs"); and that his arrest lacked probable cause. For the following reasons, the judgment of the trial court is affirmed.

## II.     Facts and Procedural Background

{¶ 2} On September 5, 2020, around 10:30 p.m., Lucas County Sheriff's Deputy Jeff Bretzloff observed a white GMC SUV traveling in the wrong direction on Dorr Street. At the time, Dorr Street was a one-way road as a result of construction. Deputy Bretzloff stopped appellant, Brandon Nation, near the intersection of McCord Road and Dorr Street. Deputy Bretzloff approached appellant at the driver's side window which appellant had already rolled down. Upon the officer's approach, appellant immediately stated "Hi, I apologize" with slurred speech. He then stated he had no idea it was a one-way street.

{¶ 3} Deputy Bretzloff noticed a strong odor of alcohol emanating from appellant's vehicle and that the appellant had bloodshot and glossy eyes. Appellant denied he had been drinking. Appellant handed his license and proof of insurance to the deputy, which was provided to the appellant from his passenger. Deputy Bretzloff found no prior arrests for appellant and asked appellant to step out of his vehicle. Upon exiting, Deputy Bretzloff told appellant he was going to need him do some field sobriety tests. Appellant complied with this request.

{¶ 4} Performance of the Horizontal Gaze Nystagmus ("HGN") test found the appellant lacked smooth pursuit of his eyes and an inability to follow directions.

2.

Performance of the HGN test also found a distinct nystagmus and that the appellant's eyes lacked a smooth tracking plane when he was asked to follow the pen up and down. Appellant denied having ever been diagnosed with natural nystagmus.

{¶ 5} On the one-leg stand test, appellant had trouble following directions. He failed to count "one thousand one, one thousand two..." until told to stop as directed. Appellant was advised that the test would last for about thirty seconds. Appellant put his left foot down prior to the deputy telling him to stop. When asked why he put his foot down, he stated that "thirty seconds is a long time." He also had difficulty following instructions on the walk and turn test; this test was performed with noticeable swaying as appellant walked heel to toe. Deputy Bretzloff also observed four empty cans of Michelob Ultra Beer in a plastic bag behind the driver's seat.

{¶ 6} Appellant was taken into custody upon completion of the performance of the field sobriety tests. Appellant refused to submit to the preliminary breath test and was taken to the Lucas County jail where he was booked. He was then charged with operating a vehicle under the influence of alcohol (OVI) in violation of R.C. 4511.19(A)(1)(a); driving the wrong way on a one-way highway in violation of R.C. 4511.32(A); and driving upon a closed highway in violation of R.C. 4511.71(A).

{¶ 7} Appellant filed a motion to suppress evidence on February 5, 2021 and asserted that there was no lawful cause to stop or detain him and that there was no probable cause to arrest him without a warrant, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sections 14 and 16 of the

3.

Ohio Constitution. Appellant also argued that the administration of the field sobriety tests that were given to him was not done in substantial compliance with the rules and regulations of NHTSA, and therefore were not admissible at trial or to be considered as a factor in determining if there was probable cause for his arrest.

{¶ 8} The motion to suppress went to a hearing before the trial court on March 11, 2021. Deputy Bretzloff was the only witness to testify; appellant also admitted into evidence chapters 7 and 8 of the 2018 version of the National Highway Traffic Safety Administration *DWI Detection and Standardized Field Sobriety Testing Manual* ("NHTSA manual"). The State submitted Deputy Bretzloff's bodycam video footage as evidence. Deputy Bretzloff testified it was reasonable to stop appellant's vehicle when it drove around a road closed sign near a construction zone by the intersection of McCord Road and Dorr Street and continued to drive the wrong way down the road approximately 100 to 150 yards until he initiated a stop.

{¶ 9} Upon approaching appellant's vehicle, Deputy Bretzloff stated he observed bloodshot and glossy eyes, slurred speech, and a strong odor of alcohol being emitted from the passenger compartment. He also noted appellant denied the consumption of any alcohol that evening but stated that he and his wife were coming from dinner. Based on these factors in conjunction with his demeanor, Deputy Bretzloff asked appellant to exit the vehicle and conducted sobriety tests. He observed six of the six clues on the HGN test, five clues on the one-leg stand test, and he thought "fourteen" clues on the walk-and-

4.

turn test. Deputy Bretzloff determined that, based on his observations that night and on a totality of the circumstances, he had probable cause to arrest appellant.

{¶ 10} The motion to suppress was filed five months after the initial incident. Appellant originally challenged the lawfulness of the traffic stop itself, the detention for field sobriety testing, his arrest for OVI, and that the SFSTs were not conducted in accordance with NHTSA standards. Appellant withdrew his original challenges to the lawfulness of the traffic stop itself, and continued to plead not guilty to OVI, challenging the conduct of the SFSTs and probable cause to arrest for OVI.

{¶ 11} On August 9, 2021, the trial court denied the motion to suppress, stating that "a police officer has probable cause for an arrest if the facts and circumstances within his or her knowledge are sufficient to cause a reasonably prudent person to believe that the defendant committed the offense." (citing *State v. Barrett*, 5th Dist. Richland No. 19 CA 23, 2019-Ohio-4270, ¶ 24). The Court reasoned that Deputy Bretzloff witnessed appellant maneuver his SUV around the road-closed sign and continue the wrong way down a one-way road. The deputy then noted appellant's bloodshot and glossy eyes, slurred speech, and a strong odor of alcohol stemming from the vehicle and appellant's person. In addition, the court noted appellant's performance on the sobriety tests and the video evidence, when viewed together with the factors previously mentioned, provided probable cause to arrest appellant for an OVI offense.

{¶ 12} After the court denied appellant's motion to suppress, on November 8, 2021, he pleaded no contest to an amended charge of a violation of R.C. 4511.194,

5.

physical control of vehicle while under the influence. He was then found guilty by the court and was sentenced to 180 days in jail, all but 177 of which were suspended upon certain terms and conditions, in addition to a $375 fine and court costs and a 12-month license suspension. The accompanying charges of one-way street and driving on a closed roadway were dismissed pursuant to a recommendation of the prosecutor.

{¶ 13} Appellant timely filed this appeal from the November 8, 2021 judgment of the trial court.

### III.    Assignment of Error

{¶ 14} Appellant presents a single assignment of error for our review: The Trial Court Erred in Overruling the Motion to Suppress.

{¶ 15} Appellant's appeal is premised upon the following two arguments:

1. The trial court erred by admitting field sobriety tests in support of probable cause, when the arresting officer did not conduct the tests in any compliance with his NHTSA training.

2. The trial court erred in concluding there was probable cause to arrest under the totality of the circumstances in this case.

### IV.    Law and Analysis
### Issue

{¶ 16} The question in this appeal is whether or not the Sylvania Municipal Court erred in denying appellant's motion to suppress.

6.

## Standard of Review

{¶ 17} Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Consequently, the appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. The appellate court applies a de novo standard of review to determine whether the facts satisfy the applicable legal standard. *Id. See also State v. Bragg,* 6th Dist. Lucas No. L-07-1162, 2007-Ohio-5993, ¶ 4; *State v. Steed*, 2016-Ohio-8088, 75 N.E.3d 816, ¶ 11 (6th Dist.). Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

{¶ 18} Appellant argues that the trial court erred in denying his motion to suppress, challenging the detention for field sobriety testing, compliance with NHTSA standards, and probable cause for this arrest. The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Ohio Constitution, Article I, Section 14 protect individuals against "unreasonable searches and seizures" by the government and protects privacy interests where an individual has a reasonable expectation of privacy. *State v. Fielding*, 2014-Ohio-3105, 15 N.E.3d 912, ¶

15 (10th Dist.), quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

{¶ 19} Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). However, in certain circumstances the United States Supreme Court has interpreted the Fourth Amendment to permit police stops of motorists in order to investigate a reasonable suspicious of criminal activity. *Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999).

{¶ 20} When determining the reasonableness of a stop, this Court has previously held that the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, 850 N.E.2d 698. In this instance, Deputy Bretzloff observed appellant drive around a road-closed sign and drive the wrong way on a one-way road for approximately 100 to 150 yards, potentially endangering any oncoming traffic that was driving the correct way down the road. We can find no error on the part of the trial court's finding that Deputy Bretzloff had probable cause to stop appellant.

{¶ 21} Appellant argues Deputy Bretzloff failed to substantially comply with NHTSA standards, citing that he failed to perform the entire HGN test and that the portions performed were incorrect. Appellant also argues the deputy could not remember the number of clues on both the one-leg stand test and walk-and-turn test, nor could he

8.

articulate the exact clues he was looking for.  Therefore, appellant reasons that the standardized field sobriety tests should have been excluded in determining whether the deputy had probable cause to arrest him for OVI.  And if the results of the SFSTs are excluded, appellant contends, the deputy did not have probable cause to arrest him.

{¶ 22} Appellant next argues that there was no probable cause to arrest him; that there was no evidence of impaired driving.  In support, he points out that he properly retrieved all requested documentation for the deputy and argues that he spoke in a normal manner and that his speech was not slurred.  He further contends that all the state can point to in support of probable cause was an odor of alcohol, bloodshot and glossy eyes, and a disputed allegation of stuttering, which appellant contends as being misclassified as slurred speech.  We are not persuaded.  A review of the record indicates that there was sufficient evidence to establish probable cause to believe that appellant was operating his vehicle in violation of R.C. 4511.19(A)(1)(a), OVI.  In this case, appellant specifically challenges the factual findings made by the trial court.

A.  Slurred Speech

{¶ 23} Appellant's primary argument in regards to a lack of clear, competent evidence rests on the trial court's characterizations of appellant's speech as slurred; appellant contends that the video evidence shows that he "stuttered" versus slurred.

{¶ 24} A review of the video evidence establishes that appellant mischaracterizes his slurred speech as "stuttering."  The evidence shows appellant indeed slurs the phrase "I apologize."  Webster's New International Dictionary of the English Language (11th

9.

Ed.2003) defines "stutter" as "to speak with involuntary disruption of blocking of speech (as by repetition or prolongation of vocal sounds)." In this instance, there was no stopping or starting of any consonant or syllable. The phrase "I apologize" was all spoken indistinctly so that the sounds ran into one another. We find no error in the finding of slurred speech by the trial court.

### B. Compliance with NHTSA standards

{¶ 25} Appellant argues that Deputy Bretzloff did not comply with the standards developed by NHTSA when he administered the SFSTs. *See* NHTSA manual. Therefore, appellant argues, the results of the tests could not be considered in determining whether the deputy had probable cause to arrest him for OVI. And if the results of the SFSTs are excluded, appellant contends, Deputy Bretzloff did not have probable cause to arrest him.

{¶ 26} Deputy Bretzloff's testimony at the suppression hearing showed that, although he did not substantially comply with NHTSA requirements when he administered the HGN test, he substantially complied with NHTSA requirements for the one-leg stand and walk-and-turn tests. Appellant exhibited sufficient clues on the one-leg stand and walk-and-turn tests to demonstrate impairment, which combined with his other observations to give the deputy probable cause to arrest appellant. Thus, although the trial court erred by denying appellant's motion to suppress the HGN test results, the error was harmless, and the court did not err in denying his motion to suppress.

10.

Admissibility of the Field Sobriety Tests

{¶ 27} Results from field sobriety tests are not admissible unless the state shows by clear and convincing evidence that the officer administered the tests in substantial compliance with NHTSA guidelines. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 11, citing R.C. 4511.19(D)(4)(b). "Substantial compliance" is not defined by the statute. Thus, whether the facts satisfy the substantial compliance standard is determined on a case-by-case basis. *State v. Mapes*, 6th Dist. Fulton No. F-04-031, 2005-Ohio-3359, ¶ 44.

{¶ 28} In his brief, appellant cites to *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 34, quoting *State v. Homan*, 89 Ohio St.3d 421, 426, 732 N.E.2d 952 (2000), *superseded by statute on other grounds*, for the proposition that "substantial compliance is no more than a 'de minimis' deviation from the prescribed rules." However, the de-minimis-deviation standard in *Burnside* is only applicable to the testing procedures detailed in R.C. 4511.19(D)(1)—i.e., tests of breath, blood, and other bodily fluids—not the testing procedures detailed in R.C. 4511.19(D)(4)—i.e., SFSTs. *See, e.g., State v. Fridley*, 2017-Ohio-4368, 93 N.E.3d 10, ¶ 15, 30 (12th Dist.) (citing different substantial-compliance standards for reviewing field sobriety tests and blood alcohol test); *and compare* Weiler, Weiler, and Katter, *Baldwin's Ohio Handbook Series Ohio Driving Under the Influence Law*, Section 7:14 (2022) (Regarding SFSTs, "[s]ince [R.C. 4511.19(D)(4)(b)] does not define substantial compliance, a determination of whether the facts satisfy the standard is made on a case-by-case basis.") *with id.* at

Section 8:25 (Because the director of the Ohio Department of Health ("ODH") has the authority to set standards for chemical tests, and judicial determination of the effect of noncompliance with the director's regulations requires courts to question the reliability of chemical tests, the Supreme Court "concluded that to avoid usurping a function that had been assigned to the Director of Health, it must limit the substantial compliance [standard] to excuse *only* errors that are clearly *de minimus* [sic] * * *." (Emphasis sic.)). The case law has not clearly articulated the distinction—and, at times, courts (including ours) have confused the two standards. *See, e.g., State v. DeVault*, 6th Dist. Ottawa No. OT-12-027, 2013-Ohio-2942; *State v. Parks*, 5th Dist. Licking No. 12-CA-87, 2013-Ohio-2492.

{¶ 29} Chemical tests of breath and bodily fluids are regulated by rules promulgated by the director of the ODH. *See* Ohio Adm.Code Chapter 3701-53. These rules "are simply the law in Ohio." *State v. Bish*, 191 Ohio App.3d 661, 2010-Ohio-6604, 947 N.E.2d 257, ¶ 42 (7th Dist.). To protect the separation of powers doctrine and prevent the courts from usurping the executive branch's rulemaking authority, the Supreme Court has determined that only "'minor procedural deviations'" will be considered substantial compliance when it comes to regulations that have the force of law. *Burnside* at ¶ 34, quoting *Homan* at 426. This prevents the courts from second-guessing decisions made by the director of the ODH and undercutting the department's rulemaking authority. *State v. Farrell*, 2021-Ohio-1554, 172 N.E.3d 488, ¶ 24 (6th Dist.).

12.

{¶ 30} Standards for SFSTs, on the other hand, come from some "official publication"—usually the NHTSA manual—that, while reliable, does not carry the force of law. *Bish* at ¶ 44, citing *State v. Frakes*, 5th Dist. Coshocton No. 07CA0013, 2008-Ohio-4204, ¶ 44-47. Because the standards for SFSTs are not laws, the separation of powers concerns that can arise with regulations promulgated by an executive branch agency simply do not exist when courts more closely examine the standards controlling SFSTs. Thus, although the issue has not been squarely before it, the Supreme Court (on the few occasions that it has addressed the statute) has not limited the substantial-compliance standard in cases involving R.C. 4511.19(D)(4) in the way that it has in cases involving R.C. 4511.19(D)(1). See *Codeluppi,* 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, at ¶ 11 (addressing the particularity required in a motion to suppress the results of SFSTs); *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 21-24 (finding the substantial-compliance standard in R.C. 4511.19(D)(4) constitutional). Accordingly, the appellate courts are left to determine in each case whether the officer substantially complied with NHTSA regulations when he administered SFSTs.

{¶ 31} For the results of SFSTs to be admissible, the state must lay a proper foundation as to (1) the administering officer's training and ability to administer the tests and (2) the actual techniques he used to administer the tests. *State v. Boles*, 2020-Ohio-4485, 158 N.E.3d 1013, ¶ 15 (2d Dist.), citing *Boczar* at ¶ 28. The state's burden of proof for the admissibility of field sobriety test results in not onerous; if unchallenged,

13.

general testimony that the officer followed all pertinent rules and regulations is sufficient. *State v. Aiken*, 6th Dist. Fulton No. F-21-005, 2021-Ohio-3503, ¶ 27, citing *Boles* at ¶ 15; and *State v. Murray*, 2d Dist. Greene No. 2002-CA-10, 2002-Ohio-4809, ¶ 11. When the defendant challenges the general testimony, however, the state is required to present more particular evidence of compliance. *State v. Murray*, 2d Dist. Montgomery No. 28373, 2020-Ohio-45, ¶ 19.

{¶ 32} Here, appellant challenged Deputy Bretzloff's general testimony that he complied with his training and NHTSA standards when he administered appellant's SFSTs. The details that emerged when Deputy Bretzloff gave more particular testimony on cross-examination—including the footage from his body camera—showed that the deputy substantially complied with the requirements in the NHTSA manual for the one-leg stand and walk-and-turn tests. Based on those tests and the other indicia of impairment that Deputy Bretzloff testified to, he had probable cause to arrest appellant for OVI, and the trial court's failure to suppress the results of the HGN test was harmless.

Horizontal gaze nystagmus test

{¶ 33} Turning first to the HGN test, Deputy Bretzloff's testimony, when considered in conjunction with the video from his body camera that was admitted into evidence at the suppression hearing, shows that he failed to administer the test in substantial compliance with NHTSA guidelines.

{¶ 34} The NHTSA manual details nine steps an officer should follow when administering the test: (1) check the subject for eyeglasses or contact lenses, (2) provide

14.

verbal instructions for the test, (3) position the stimulus 12 to 15 inches in front of the subject and slightly above eye level, (4) check for equal pupil size and resting nystagmus, (5) check for equal tracking, (6) check for lack of smooth pursuit, (7) check for distinct and sustained nystagmus at maximum deviation, (8) check for onset of nystagmus prior to 45 degrees, and (9) total the clues.[1] NHTSA manual, Session 8, 31-32. The officer is supposed to verbally instruct the subject to (1) stand with their feet together and their hands at their sides, (2) keep their head still, (3) look at the stimulus, (4) follow the movement of the stimulus with their eyes only, and (5) keep looking at the stimulus until the officer tells them that the test is over. *Id.* at 33.

{¶ 35} When checking the subject's eyes, the manual instructs officers to check for each of the three clues in each eye independently—resulting in a maximum possible score of six clues of impairment—and to repeat the test for each clue twice on each eye. *Id.* at 38. That is, to complete the HGN test as prescribed by the NHTSA manual, an officer would have to complete a minimum of 14 "passes" of the stimulus in front of the eyes—at least one pass per eye (or two total passes) to check for equal tracking and two passes per eye (or four total passes) for each of the three clues.

{¶ 36} Regarding specific instructions for each portion of the HGN test, to check for lack of smooth pursuit, the manual instructs the officer to move the stimulus

---

[1] The manual also includes the optional vertical gaze nystagmus test that Deputy Bretzloff did not testify about in this case.

15.

smoothly, steadily, without stopping at the sides or center, and at a speed that takes approximately two seconds to get from the center to the side. *Id.* at 41. For distinct and sustained nystagmus at maximum deviation, the manual requires the officer to move the stimulus toward the subject's shoulder until their eye has gone as far as possible and then hold the stimulus there for a minimum of four seconds. *Id.* at 45. The manual specifically notes that an officer "cannot simply hold the eye to the side for an instant and expect to observe distinct jerking." *Id.* It also points out that the eye will not experience "fatigue nystagmus" unless it is held at maximum deviation for more than 30 seconds. *Id.* at 46. The manual is quite clear that this clue does not count unless the nystagmus is distinct and sustained for at least four seconds. Finally, for onset before 45 degrees, the manual says that the officer should move the stimulus at a speed that takes approximately four seconds to reach a 45-degree angle, and when the officer sees jerking start, he should hold the stimulus steady, ensure that the jerking continues, and determine whether the stimulus is before or after 45 degrees. *Id.* at 51.

{¶ 37} Deputy Bretzloff testified that he first asked if appellant had ever been diagnosed with "natural nystagmus" and if he could see the stimulus that the deputy was holding 12 to 15 inches from appellant's face. Next, he checked appellant's eyes for "[s]mooth pursuit * * * two to three times." He also testified—in response to leading questions by the prosecutor and without providing any details on how he performed these portions of the test beyond "basically looking at, going from the center point of the, of the face out to the just lateral point of the shoulder looking [at] his eye[s] * * *"—that

16.

appellant's eyes tracked equally, he had onset of nystagmus before 45 degrees, and had distinct and sustained nystagmus at maximum deviation. Deputy Bretzloff concluded that appellant showed six of six clues on the HGN test.

{¶ 38} On cross-examination, Deputy Bretzloff conceded that he did not conduct parts of the HGN test exactly as prescribed by the NHTSA manual. Specifically, (1) he did not ask appellant if he had any head injuries before beginning the test; (2) he did not hold the stimulus for more than "a second" when checking for distinct and sustained nystagmus at maximum deviation because he did not "want to overstimulate the eye"; (3) when checking for onset before 45 degrees, he moved the stimulus at "the same speed and duration" as he did for the other two tests; and (4) he only completed ten total passes, which was less than the 16 total passes required by the NHTSA manual.[2]

{¶ 39} The video from Deputy Bretzloff's body camera showed that he gave appellant instructions that were substantially similar to those in the NHTSA manual. He told appellant to stand with his feet together and arms at his sides, asked if he had contacts in, asked if he could see the tip of the pen that the deputy was using as the

---

[2] During cross-examination, defense counsel and Deputy Bretzloff arrived at 16 total passes by adding two passes per eye (four total passes) for the officer's assessment of equal tracking. Although the NHTSA manual says that the equal tracking "check *may* be done more than once[,]" it only *requires* one pass per eye (two total passes) to check for equal tracking. (Emphasis added.) NHTSA manual, Session 8, 34.

17.

stimulus, told him to follow the tip of the pen with only his eyes, asked if appellant understood the instructions, and appeared to hold the pen an appropriate distance in front of appellant's face. At the beginning of the test, Deputy Bretzloff repeated his instructions that appellant was to follow the pen with only his eyes and was to hold his head still twice when he believed that appellant was not following instructions. He stopped moving the stimulus—and subsequently restarted his HGN assessment—each time he reinstructed appellant. Midway through the test, Deputy Bretzloff asked appellant if he had ever been diagnosed with "natural nystagmus." The passes that the deputy completed took approximately two to four seconds each, and he moved the stimulus at approximately the same speed throughout the test.

{¶ 40} Of the ten total passes that Deputy Bretzloff completed (excluding the vertical passes that he did in the middle of the test and that were not discussed by either side at the suppression hearing), seven passes were of appellant's left eye and three were of his right eye. Because Deputy Bretzloff did not vary the speed of his passes, hold the stimulus to check for distinct and sustained nystagmus, or do an equal number of passes on each eye, it is not possible to tell from the video alone which clue the deputy is checking with each pass.

{¶ 41} In its judgment entry denying appellant's motion to suppress, the trial court determined that Deputy Bretzloff substantially complied with NHTSA guidelines in administering appellant's HGN test because the deputy "describe[d], in detail, the steps for administering the HGN test and testified that he had performed the test in accordance

18.

with the guidelines[,]" and Deputy Bretzloff's failure to conduct the appropriate number of passes was excused by appellant's "lack of cooperation and/or his inability to perform the test * * *."

{¶ 42} Deputy Bretzloff's administration of the HGN test to appellant does not constitute substantial compliance with NHTSA requirements. Although the times in the manual for completing each pass (and, consequently, the speed at which the officer completes each pass) are approximate, the time that the officer must hold the stimulus while checking for distinct and sustained nystagmus is not. *Murray,* 2d Dist. Montgomery No. 28373, 2020-Ohio-45, at ¶ 20, 26; *State v. Scott*, 6th Dist. Lucas No. L-21-1128, 2022-Ohio-2071, ¶ 37 (citing cases). Similar to the length of the hold for distinct and sustained nystagmus, the requirement that officers complete two passes of each eye to check for each of the three clues of impairment is a "mandate[]" rather than a "guideline[]." *Murray* at ¶ 20. The NHTSA manual repeatedly mentions that the administering officer should check each eye twice or do two passes of each eye when checking for each clue; it does not say that a second pass is "optional" or that the officer can do "approximately" two passes. *See* NHTSA manual, Session 7, 11; Session 8, 35, 38, 40, 41, 43.

{¶ 43} We are mindful that we must accept the trial court's findings of fact if they are supported by some competent, credible evidence. *Codeluppi,* 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, at ¶ 7, citing *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8; *State v. Jones-Bateman*, 6th Dist. Wood Nos. WD-11-074

19.

and WD-11-075, 2013-Ohio-4739, ¶ 9. However, we cannot find that the trial court's assessment of the facts surrounding the HGN test meet that standard.

{¶ 44} Deputy Bretzloff did not provide much, if any, independent information about what the guidelines for the HGN test are or how he administered the test in appellant's case. The bulk of his direct testimony consisted of answers to the prosecutor's leading questions, and his testimony that he conducted the test in accordance with NHTSA guidelines is belied by his testimony on cross and—importantly—the video footage from his body camera. Despite providing accurate instructions and doing some of the required preliminary questioning, Deputy Bretzloff failed to do at least three mandatory passes of appellant's right eye and testified that he intentionally—albeit mistakenly—failed to administer the mandatory four-second hold when checking for distinct and sustained nystagmus at maximum deviation. Under these circumstances, we cannot find that Deputy Bretzloff's administration of the HGN test substantially complies with NHTSA's guidelines.

{¶ 45} Regardless, the trial court's failure to suppress the results of the HGN test was harmless because Deputy Bretzloff substantially complied with NHTSA guidelines for the one-leg stand and walk-and-turn tests, giving him probable cause to arrest appellant for OVI.

One-leg stand test

{¶ 46} The second SFST that Deputy Bretzloff administered to appellant was the one-leg stand test. Appellant argues that the deputy could not have administered the one-

20.

leg stand test correctly because when he testified "[h]e was unable to accurately identify the standardized clues [from the NHTSA manual], inaccurately listed observations that were not clues and was unable to correctly articulate factors that supported his arrest decision."

{¶ 47} Although Deputy Bretzloff's testimony about this SFST—standing alone—does not show substantial compliance with NHTSA guidelines, the record as a whole shows that Deputy Bretzloff did substantially comply.

{¶ 48} To administer the one-leg stand test, the NHTSA manual requires the testing officer to (1) ask if the subject has any physical problems or disabilities because people over age 65, who have back, leg, or inner ear problems, or who are 50 or more pounds overweight could have difficulty performing the test; (2) conduct the test on a reasonably dry, hard, level, non-slippery surface; (3) verbally instruct the subject to (a) stand with their feet together and arms at their sides, (b) not to start the test until told, (c) when told to begin, lift either foot approximately six inches off the ground, keeping the foot parallel to the ground, (d) keep both legs straight and arms at their sides the whole time, (e) count out loud starting with 1,001 until told to stop, and (f) watch their raised foot; (4) demonstrate each part of the test; (5) ensure that the subject understands the instructions and answer any questions before beginning the test; (6) time the subject and stop the test after 30 seconds; and (7) if the subject puts their foot down during the test, tell them to pick up their foot and continue counting from the point when their foot touched the ground. NHTSA manual, Session 8, 73, 75-76.

21.

{¶ 49} The NHTSA manual list four clues for the one-leg stand test: (1) swaying while balancing, which means distinct, noticeable side-to-side or front-to-back motion of the body or raised foot; (2) using arms for balance, which means moving one or both arms six or more inches from their side in order to keep their balance; (3) hopping to keep balance; and (4) putting their foot down. A subject showing two or more clues, or failing to complete the test, indicates impairment. *Id.* at 77-79.

{¶ 50} At the hearing, Deputy Bretzloff testified that he gave appellant instructions that were substantially similar to those in the NHTSA manual. The video showed that the deputy asked appellant if he had any physical problems that could affect the test, and showed that the age and weight concerns did not apply to appellant. Deputy Bretzloff said that the clues he was looking for included appellant removing his arms from his sides, putting his foot on the ground, "excessive movement in the legs," hopping, "swerving," not looking at his raised foot, and something involving counting that was inaudible. He testified that he actually observed that appellant "failed to look at his raised foot, failed to count out loud, placed his foot down twice prior to being instructed to do so, and had excessive movement in his non-raised leg while trying to maintain his balance * * *."

{¶ 51} On cross-examination, Deputy Bretzloff was not able to recall the exact number of clues in the NHTSA manual for the one-leg stand test, and said that he believed that the manual required three clues to make a proper arrest decision.

22.

{¶ 52} Although Deputy Bretzloff did not have the list of indicators that he was supposed to be looking for precisely correct, and not all of the things that he observed are "clues" according to the NHTSA manual, on the whole, he conducted the one-leg stand test in compliance with NHTSA guidelines. In addition to asking appropriate preliminary questions and giving appropriate instructions, Deputy Bretzloff testified to two indicators of impairment. Appellant putting his foot down is a clue listed in the NHTSA manual, and the video from Deputy Bretzloff's body camera shows that the "excessive movement in [appellant's] non-raised leg * * *" that the deputy described was swaying, i.e., distinct, noticeable side-to-side and front-to-back movement, which is also a clue. The video also showed that appellant put his foot down, looked at Deputy Bretzloff, shrugged, and stopped the one-leg stand test before the deputy told him to stop and before 30 seconds had elapsed. In other words, Deputy Bretzloff testified—albeit imprecisely—that he observed two clues of impairment, and the evidence showed that appellant failed to complete the test, which the NHTSA manual also lists as a sign of impairment.

{¶ 53} Appellant cites to *S. Euclid v. Bautista-Avila*, 2015-Ohio-3236, 36 N.E.3d 246 (8th Dist.), for the proposition that an officer does not administer SFSTs in substantial compliance with the NHTSA manual when "the officer is mistaken about which indicators he was testing and chang[es] indicators to include his own observations * * *." The court in *Bautista-Avila* did not make such a broad, generalized holding, however. Rather, based on the specific facts of that case, the Eighth District upheld the trial court's suppression of SFSTs. And the facts of *Bautista-Avila* are distinguishable.

23.

{¶ 54} Overall, the officer in *Bautista-Avila* demonstrated far less knowledge about the process for administering SFSTs and the indicators of intoxication that he was supposed to be looking for during the tests than Deputy Bretzloff did in this case. *See id.* at ¶ 11-16. The Eighth District also noted that the video of the SFSTs "was not consistent with [the officer's] testimony[,]" *id.* at ¶ 13, which—with the exceptions discussed regarding the HGN test—is not true here.

{¶ 55} Specifically regarding the one-leg stand test, the officer in *Bautista-Avila* admitted that one of the so-called clues that he noted—that Bautista-Avila "kept looking at his toe"—was not a clue in the NHTSA manual, but was "his own indicator."[3] *Id.* at ¶ 16. Notably, the court did not say whether the officer observed any of the indicators from the NHTSA manual, i.e., whether the officer saw the minimum two clues required to determine that Bautista-Avila was intoxicated. In contrast, although Deputy Bretzloff was mistaken about some of the indicators from the NHTSA manual, he did not intentionally make up and use his own indicators of intoxication, and—critically—he actually observed two of the clues of impairment from the NHTSA manual. This makes *Bautista-Avila* inapplicable to appellant's case.

---

[3] The Eighth District cited the 2006 version of the NHTSA manual in its decision. The court did not include the one-leg stand test instructions from that version of the manual in its decision, but the officer's testimony leads to the conclusion that the 2006 version did not instruct the subject to look at his raised foot during the test.

24.

{¶ 56} Because the record as a whole shows that Deputy Bretzloff substantially complied with NHTSA guidelines in administering the one-leg stand test, the trial court properly denied appellant's motion to suppress this test.

Walk-and-turn test

{¶ 57} The final SFST that Deputy Bretzloff administered to appellant was the walk-and-turn test. Appellant argues that the deputy failed to comply with the NHTSA manual when he administered and interpreted this test because he could not recall how many indicators the test has, but believed that he observed 14 clues from appellant, he observed things that are not clues in the manual, and he instructed appellant to walk in a "relatively straight path" instead of a straight line.

{¶ 58} Again, while Deputy Bretzloff's testimony about this SFST—standing alone—does not show substantial compliance with NHTSA guidelines, the record as a whole shows that he substantially complied with the guidelines.

{¶ 59} To administer the walk-and-turn test, the NHTSA manual requires the testing officer to (1) check the same environmental and physical factors as the one-leg stand test; (2) verbally instruct the subject to (a) put their left foot on the (real or imaginary) line, put their right foot in front of their left with the heel of the right against the toe of the left, and keep their arms at their sides, (b) stay in that position until the instructions are finished and not to start the test until told, (c) when told to begin, take nine heel-to-toe steps on the line, turn, and take nine heel-to-toe steps back, (d) to turn, keep their front foot on the line and take a series of small steps with the other foot, (e)

25.

while walking, keep their arms at their sides, watch their feet, and count their steps out loud, and (f) once they start walking, not to stop until they are finished; (3) demonstrate at least three steps each direction and the process for turning; and (4) ensure that the subject understands the instructions and answer any questions before beginning the test. NHTSA manual, Session 8, 62, 64-65.

{¶ 60} The NHTSA manual lists eight clues for the walk-and-turn test: (1) the subject cannot balance while listening to the instructions, which means that the subject breaks the heel-to-toe stance during the instructions; (2) the subject starts too soon; (3) the subject stops while walking; (4) the subject does not touch their feet heel-to-toe, which means there is one-half inch or more between the feet on any step; (5) the subject steps off of the line they are walking on, which requires the subject to step so that a foot is entirely off the line; (6) the subject uses their arms to balance, which means that they raise one or both arms six inches or more from their side to maintain balance; (7) the subject makes an improper turn by removing their front foot from the line during the turn, not turning in the manner instructed, or losing their balance during the turn; and (8) the subject takes an incorrect number of steps in either direction. *Id.* at 66-70.

{¶ 61} At the suppression hearing, Deputy Bretzloff testified that he verbally instructed appellant to "maintain a heal-to-toe [sic] step"; keep his arms at his sides during the instructions; take nine heel-to-toe steps each direction on "a relatively straight path" with his arms at his sides, looking at his feet, and counting his steps out loud; and

26.

after his ninth step in the first direction, turn around by making a series of small pivot steps. He said that he also demonstrated all of these instructions for appellant.

{¶ 62} The video includes additional instructions that Deputy Bretzloff did not mention in his testimony. The deputy actually instructed appellant to (1) stand with his right foot on the white edge line of the road, put his left foot in front of his right "in a heel-to-toe step," keep his arms at his sides, and hold that position until Deputy Bretzloff told him to do otherwise; (2) "take nine heel-to-toe steps down this white line" with his arms to his sides, looking at his feet, and counting his steps out loud; (3) after taking nine steps, make a series of small pivot steps to turn and face the direction he just came from; and (4) repeat the process in the other direction, walking heel-to-toe, arms to his sides, looking at his feet, and counting his steps out loud until he got to nine. Deputy Bretzloff demonstrated each part of the test as he was giving appellant the instructions, although what he was doing as he was demonstrating the test is not visible on the video,[4] and asked if appellant understood the instructions. Taken together, Deputy Bretzloff's testimony and the video show that he substantially complied with NHTSA guidelines when he instructed appellant on the walk-and-turn test.

---

[4] This fact is largely inconsequential because "R.C. 4511.19 only requires the administration, not the demonstration, of field sobriety tests to be conducted in substantial compliance with the NHTSA standards." *State v. Way*, 12th Dist. Butler No. CA2008-04-098, 2009-Ohio-96, ¶ 17, citing *State v. Perl,* 11th Dist. Lake No. 2006-L-082, 2006-Ohio-6100, ¶ 14. Therefore, the fact that Deputy Bretzloff demonstrated the test at all would seem to be sufficient to comply with the demonstration requirement in the NHTSA manual.

27.

{¶ 63} Regarding the clues for the walk-and-turn test, Deputy Bretzloff said that he looks for lack of balance, removing the arms from the sides to maintain balance, the subject failing to look at their steps, not counting out loud, staying heel-to-toe, staying on a straight path, any stopping during the test, and the pivot steps during the turn. Deputy Bretzloff said that he thought appellant demonstrated 14 clues of impairment, but "would have to * * * look at [his] report * * *." He also said that the clues would be on the video. On cross-examination, Deputy Bretzloff was not able to recall the exact number of clues in the NHTSA manual for the walk-and-turn test or how many the manual required to make a proper arrest decision, but said that he had a form on his phone that he could refer to.

{¶ 64} Deputy Bretzloff's report, which is in the record, noted that appellant failed to follow instructions and began the test prior to being instructed, failed to maintain a heel to toe step on step four of the first set, failed to complete the pivot steps as instructed, stumbled while attempting to turn and failed to maintain a heel-to-toe step throughout the rest of the test as he was instructed to do.

{¶ 65} These observations are confirmed by the video and constitute more than the two clues necessary, according to the NHTSA manual, to classify a subject as intoxicated. So, although Deputy Bretzloff's testimony was insufficient to show that he administered the walk-and-turn test in substantial compliance with NHTSA guidelines, when the totality of the evidence before the trial court is considered, the state met its

28.

burden of showing that the deputy administered the walk-and-turn test in substantial compliance with NHTSA standards.

## Conclusion

{¶ 66} Deputy Bretzloff did not substantially comply with NHTSA guidelines when he administered the HGN test, so the trial court should have suppressed the results of that test. However, the deputy's testimony, combined with the other evidence in the record, showed that he substantially complied with NHTSA guidelines when he administered the one-leg stand and walk-and-turn tests, so the trial court properly denied appellant's motion to suppress the results of those tests.

{¶ 67} Finally, the results of the one-leg stand and walk-and-turn tests, combined with the other indicia of impairment that Deputy Bretzloff observed, gave the deputy probable cause to arrest appellant for OVI. The trial court correctly denied appellant's motion to suppress on that basis.

## Probable Cause

{¶ 68} "'Probable cause "has come to mean more than bare suspicion," but "less than evidence which would justify condemnation" or conviction.'" *Bautista-Avila*, 2015-Ohio-3236, 36 N.E.3d 246, at ¶ 17, citing *United States v. Thomas*, 11 F.3d 620, 627 (6th Cir.1993), quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). "[E]ach 'drunken driving' case is to be decided on its own particular and peculiar facts." *Id.* at ¶ 18, citing *Mentor v. Giordano*, 9 Ohio St.2d 140, 146, 224 N.E.2d 343 (1967).

29.

{¶ 69} "Probable cause is generally defined as a reasonable ground of suspicion supported by facts and circumstances sufficiently strong in themselves to warrant a prudent person in believing an accused person has committed or was committing an offense." *State v. Christopher*, 12th Dist. Clermont No. CA2009-08-041, 2010-Ohio-1816, ¶ 16. Probable cause to arrest for OVI exists when, at the moment of arrest, the arresting officer had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, to cause a prudent person to believe the accused was driving under the influence of alcohol. *Way*, 12th Dist. Butler No. CA2008-04-098, 2009-Ohio-96, at ¶ 30. A court makes this determination based on the totality of the facts and circumstances surrounding the arrest. *State v. Aslinger*, 12th Dist. Preble No. CA2011-11-014, 2012-Ohio-5436, ¶ 13, citing *Homan*, 89 Ohio St.3d at 427, 732 N.E.2d 952. A finding of probable cause is therefore objective, not subjective. *State v. Willis*, 12th Dist. Butler No. CA2012-08-155, 2013-Ohio-2391, ¶ 25; *see also State v. Shelton*, 12th Dist. Clermont No. CA2019-01-010, 2019-Ohio-4207, ¶ 6.

{¶ 70} Probable cause to arrest may exist, even without field sobriety tests results, if supported by such factors as: evidence that the defendant caused an automobile accident; a strong odor of alcohol emanating from the defendant; an admission by the defendant that he or she was recently drinking alcohol; and other indicia of intoxication, such as red eyes, slurred speech, and difficulty walking. *Oregon v. Szakovits,* 32 Ohio St.2d 271, 291 N.E.2d 742 (1972); *Fairfield v. Regner,* 23 Ohio App.3d 79, 84, 491 N.E.2d 333 (12th Dist.1985); *State v. Bernard,* 20 Ohio App.3d 375, 376, 485 N.E.2d

30.

783 (9th Dist.1985); *Westlake v. Vilfroy,* 11 Ohio App.3d 26, 27, 462 N.E.2d 1241 (8th Dist.1983); *State v. Judy,* 5th Dist. Delaware No. 2007-CAC-120069, 2008-Ohio-4520, ¶ 27.

{¶ 71} In the case at bar, the probable cause to arrest appellant for OVI was supported by the deputy's observing him operating his vehicle in the wrong direction on a one-way road in a construction area. The deputy also observed glossy eyes and the odor of alcohol. Appellant's wife, a passenger at the time, admitted to drinking "a little." The deputy also observed the four empty beer cans in a plastic bag behind the driver's seat. Appellant also poorly performed the field sobriety tests. Accordingly, the totality of the evidence gave rise to probable cause to arrest for OVI. As such, we find it was not error for the trial court to determine there was probable cause to support appellant's arrest for OVI, in violation of R.C. 4511.19(A)(1)(a), operating a vehicle under the influence of alcohol.

## V. Conclusion

{¶ 72} On consideration whereof, the judgment of the Sylvania Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24(A)(4).

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____

Gene A. Zmuda, J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.